**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

GLYNN JONES,

          Plaintiff,

vs.

CARGILL, INC.,

          Defendant.

No. 05-CV-129-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    **JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . **4**

V.    **SUMMARY JUDGMENT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
       A.     *Background Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
       B.     *Early Years* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
       C.     *Modhouse Job Bid* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
       D.     *First Months on the Modhouse Job* . . . . . . . . . . . . . . . . . . . **7**
            1.     *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
            2.     *Testing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
            3.     *Training* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
       E.     *Racist Language* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
       F.     *Early 2002 Complaints* . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
       G.    *Facial Hair* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
       H.    *Overtime Allegation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
       I.     *November of 2002 Complaint* . . . . . . . . . . . . . . . . . . . . . . **10**
       J.     *"J.R." Comment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
       K.    *Locker Incident* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
       L.    *PM Incident* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

  *M.*  *Eric Fisher* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**VI.**  *CONTINUING VIABILITY OF* **MCDONNELL-DOUGLAS** . . . . . . . . . **15**

**VII.** *DISCRIMINATION CLAIMS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
  *A.*  *Prima Facie Case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
    *1.*  *Membership in a protected class* . . . . . . . . . . . . . . . **17**
    *2.*  *Qualification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
    *3.*  *Adverse employment action* . . . . . . . . . . . . . . . . . . . **19**
    *4.*  *Circumstances giving rise to an inference of discrimination* . **19**
    *5.*  *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
  *B.*  *Legitimate, Non-Discriminatory Reason* . . . . . . . . . . . . . . . . . . **21**
  *C.*  *Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
  *D.*  *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

**VIII.** *RETALIATION CLAIMS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
  *A.*  *Prima Facie Case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
    *1.*  *Protected activity* . . . . . . . . . . . . . . . . . . . . . . . . **23**
    *2.*  *Adverse employment action* . . . . . . . . . . . . . . . . . . . **24**
    *3.*  *Causal connection* . . . . . . . . . . . . . . . . . . . . . . . . . **25**
  *B.*  *Legitimate, Non-Discriminatory Reason* . . . . . . . . . . . . . . . . . . **28**
  *C.*  *Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**
  *D.*  *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**IX.**  *DISPOSITION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

## I. INTRODUCTION

  The matter before the court is Defendant Cargill, Inc.'s Motion for Summary Judgment ("Motion") (docket no. 13).

## II. PROCEDURAL BACKGROUND

  On July 26, 2006, Plaintiff Glynn Jones filed a two-count Complaint against Defendant.[1] In Count I, Plaintiff alleges race-based discrimination and retaliation, in

---

  [1] A number of other entities, including an arbitrator, reviewed Plaintiff's allegations
(continued...)

violation of the Iowa Civil Rights Act of 1965, Iowa Code ch. 216 ("ICRA"). In Count II, Plaintiff alleges race-based discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981. On December 22, 2005, Defendant filed an Answer, in which it denied the substance of the Complaint.

On January 2, 2007, Defendant filed the Motion. On February 5, 2007, Plaintiff filed a Resistance. On February 15, 2007, Plaintiff filed a Reply.

Neither party requests oral argument, and the court finds that oral argument is not necessary. The Motion is fully submitted, and thus the court turns to consider it.

## III. *JURISDICTION*

The court has federal question jurisdiction over Count II. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."). The court has supplemental jurisdiction over Count I. *See id.* § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy."). *But see id.* § 1367(c) (granting district courts discretion to decline to exercise supplemental jurisdiction over state law claims under certain circumstances).

---

[1] (…continued)

before he filed his Complaint. Plaintiff argues that the arbitrator's decision is inadmissible in this summary judgment proceeding. *See* Memorandum (docket no. 22-4) (citing Fed. Rs. Evid. 403, 801, 802 & 803). Defendant does not respond to this argument. Accordingly, the court shall not consider the arbitrator's decision. *Cf. Donnell v. City of Cedar Rapids*, 437 F. Supp. 2d 904, 920-24 (N.D. Iowa 2006) (declining to give preclusive effect to an arbitrator's decision that the plaintiff's claims of wrongful discharge were unfounded).

3

## IV.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Id*.  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery,* 450 F.3d at 820 (citing *Drake ex rel. Cotton v. Koss,* 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.,* 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial.").  The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.,* 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

4

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244. To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341.

Nevertheless, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Nw. Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citation and internal citation omitted); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must be used to determine whether summary judgment is appropriate).

## V. SUMMARY JUDGMENT FACTS

Viewed in the light most favorable to Plaintiff and affording him all reasonable inferences, the summary judgment facts are these:

### A. Background Facts

Defendant operates a corn milling plant in Cedar Rapids, Iowa ("Plant"). Defendant employs approximately 250 people at the Plant. Presently, only three full-time employees are African-Americans. There are no African-Americans in management at the Plant.

5

The Chauffers, Teamsters and Helpers, Local Union No. 238 ("Union") represents workers at the Plant, pursuant to a Collective Bargaining Agreement ("CBA"). The CBA permits Defendant to fire any employee without notice for dishonesty. Consistent with the CBA, Defendant's General Code of Conduct allows the immediate termination of an employee for "committing a dishonest act . . . or acting improperly . . . in completing or falsifying [Defendant's] records or reports."

### B. Early Years

On February 26, 1990, Defendant hired Plaintiff, an African-American male. During his first eleven years of employment, Plaintiff held various positions throughout the Plant, including some work in its Starch Modification Department ("Modhouse"). Plaintiff was a good employee. Plaintiff had an almost perfect attendance record, an excellent safety record and served on multiple employee committees. He had a good relationship with his coworkers.

### C. Modhouse Job Bid

On October 17, 2001, Defendant advertised an opening for a General Operator ("GO") in the Modhouse. The primary responsibility of the GO was "to modify and dry corn starch in accordance with established manufacturing procedures." Other responsibilities included (1) knowing, understanding and following all assigned tasks; (2) "complet[ing] all required documentation according to established procedures"; and (3) working with ethylene oxide ("EO").

On or about October 23, 2001, Plaintiff and several other employees "bid" for the GO job. Plaintiff submitted his bid, even though he believed that management and the current Modhouse employees did not want him to get the job.

Defendant awards bids on the basis of seniority. Because Plaintiff had the most seniority of all bidders, Defendant awarded Plaintiff the GO job.

6

### D. First Months on the Modhouse Job

#### 1. Players

In late 2001, Plaintiff began training in the Modhouse. Plaintiff's immediate supervisor was Kelly Schmitt. Schmitt's Operations Manager was John Bro. Michael Vlasak was the Plant's Facility Manager and ran the entire Plant. Plaintiff's coworkers in the Modhouse were Brian Anson, Dale DeHoedt, David Wilhelmi[2] and John Nost. All of Plaintiff's coworkers and supervisors were Caucasian.

#### 2. Training

On January 2, 2002, Schmitt sent Plaintiff a written memorandum, in which she stated that his training would consist of some formal training and also "spending time on the job with current mod operators in an effort to learn from them everything they know about the job." When Plaintiff arrived, he expected that his coworkers would help train him, because it was a common practice at the Plant in other departments. When Plaintiff asked his coworkers for help, however, they left his presence or told him: "I don't have time" or "go find it yourself."

Plaintiff repeatedly complained to Schmitt that he was not receiving adequate training. Schmitt was nonchalant and told Plaintiff that it was his responsibility to train himself. Plaintiff tried to learn how to do his job, in spite of the fact that others were not helping him.

#### 3. Testing

When Plaintiff started working in the Modhouse, he expected that he would be required to achieve a 70% passing rate on all examinations. This was the standard to which Defendant had held Plaintiff in other departments. Further, the last employee to train in

---

[2] David Wilhelmi's nicknames were "Boss Man" and "Teflon."

7

the Modhouse, Anson, was held to a 70% passing rate in December of 1999. The GO job bid did not list a different passing rate.

After Plaintiff began working in the Modhouse, Schmitt told him that he would be held to a 80% passing rate. Terry Porter, a Caucasian refinery worker at the Plant, told Plaintiff: "[I]t's 70% for the majority and 80% for the minority." Defendant also required Plaintiff to take more tests than Anson. The 80% passing rate was never applied to all employees at the Plant. One of Plaintiff's union stewards, Eric Fisher, told Plaintiff that the standards were made more onerous for Plaintiff because "they" wanted to keep Plaintiff out of the Modhouse.

Plaintiff passed all of the tests and became qualified to work in the Modhouse.

### E. Racist Language

On February 15, 2002, one of Defendant's employees, Jerry Pisney, used racist language in Plaintiff's presence in the control room of the Modhouse. Plaintiff was sitting in the control room at a computer trying to train himself. Pisney and other Caucasians, including DeHoedt and Nost, were having a conversation nearby. Pisney said:

> [T]here's got to be an easier way to make a living. Maybe I should rob a bank or something. With my bad luck, I would be caught and thrown into a jail with a big guy named Bubba. Yeah that nigga would have me bent over and sticking it to me.

Pl's Ex. 10, at 1; *accord* Pl's Ex. 39, at 181-82.

On February 20, 2002, Plaintiff filed a written complaint about the incident. He gave copies of his complaint to Schmitt, Bro, Vlasak and Michelle Usher, Defendant's human resources employee at the Plant. On March 6, 2002, Vlasak gave Pisney a written "verbal warning" that "[a]ny future incidents such as this will result in further disciplinary

8

action."[3]  A written "verbal warning" is one of Defendant's lowest levels of discipline.

## F. Early 2002 Complaints

In early 2002, Plaintiff formally complained to Vlasak about the lack of training and change in testing standards.  Vlasak referred Plaintiff to Employee Relations Representative Michael Hyatt.  Hyatt was stationed at Defendant's corporate office in Minneapolis, Minnesota.

Plaintiff then complained directly to Hyatt about racial discrimination and harassment at the Plant.  Plaintiff's complaints to Hyatt were wide-ranging.  They included, but were not limited to, the following: (1) Defendant had a poor record of hiring and retaining minority workers; (2) Defendant had recently hired a less qualified Caucasian applicant, Alex Wilhelmi,[4] over a more qualified African-American applicant, Maurice Coleman; (3) Defendant was holding minority employees to higher testing standards than Caucasians; and (4) Defendant was subjecting him to racist slurs and jokes.

On April 23, 2002, Hyatt prepared a written report about Plaintiff's complaints.  In the report, Hyatt dismissed most of Plaintiff's concerns.  He acknowledged, however, that Pisney had used racist language in Plaintiff's presence.  Hyatt recommended "further follow-up . . . as either a focus group or plant-wide training."  At Hyatt's behest, Defendant later conducted additional training with management, supervisors and front-line supervisors.

---

[3] On May 17, 2002, Vlasak issued a similar warning to another employee, Mark Vozenilek, who referred to Oprah Winfrey as a "nigger bitch" in front of another African-American employee, Dick Cook.  On another occasion, Plaintiff stated, in the presence of a Canadian janitor, that "all Canadians ought to be taken out and shot."  Plaintiff was not disciplined for this statement.

[4] David Wilhelmi is Alex Wilhelmi's father.

9

### G.  Facial Hair

After Plaintiff began training and complained about racial discrimination and harassment at the Plant, Schmitt and Bro told Plaintiff to shave his moustache. Plaintiff challenged Schmitt and asked her why Caucasian employees in the Modhouse, including Nost, were permitted to have facial hair. Plaintiff also pointed out to Schmitt that Nost's facial hair was larger and bushier than Plaintiff's facial hair. Plaintiff contended that Nost's moustache presented a greater safety concern than his own, because Nost's moustache was more likely to interfere with the seal between the Nost's face and mask. Schmitt told Plaintiff that the rule did not apply to Nost, because it was a new policy and Nost was "grandfathered in" under an old policy that allowed facial hair.

### H.  Overtime Allegation

On November 9, 2002, David Wilhelmi falsely alleged that Plaintiff had collected overtime pay that he had not earned. Defendant investigated the claim and found no evidence to support the allegation.

### I.  November of 2002 Complaint

On November 20, 2002, Plaintiff formally complained about racial discrimination and harassment to Sue Sjeklocha. Sjeklocha, like Hyatt, worked in the human resources department at Defendant's corporate office in Minneapolis. In a written memorandum, Plaintiff alleged that "certain individuals [were] trying to sabotage [his] job and reputation." He also expressed his disappointment with Hyatt's "supposed[] . . . investigation" about his complaints of racial discrimination and harassment and lack of "follow-up."

In late 2002 or early 2003, Defendant sent two human resources officials from other plants to investigate Plaintiff's complaints. Cecilia Vocke, who worked in Dayton, Ohio, and one of her subordinates, Carole Harvey, who worked in Eddyville, Iowa, met with Plaintiff.

After the meeting with Harvey and Vocke, Plaintiff continued to complain about discrimination at the Plant. In late January of 2003, Harvey agreed to meet with Plaintiff at the Plant. Harvey set up individual appointments with Plaintiff and his coworkers for February 4, 2003, in order to discuss Plaintiff's concerns. It was common knowledge around the Plant that Harvey was coming to investigate Plaintiff's allegations of racial discrimination and harassment on February 4, 2003.

### J. "J.R." Comment

At the end of January of 2003, Jim Maxson, one of Defendant's employees, referred to Plaintiff as "J.R." in Plaintiff's presence. J.R. was a retired African-American employee. When Plaintiff protested, the employee stated "all you guys look alike."

Plaintiff complained to Bro. Bro told Plaintiff to "stop complaining because someone [is] going to get fired."

### K. Locker Incident

On February 3, 2003, the day before Harvey was scheduled to come to the Plant, someone cut the padlock on Plaintiff's locker and vandalized it. Plaintiff complained to Vlasak.

Vlasak and Bro began an investigation. Three witnesses gave them false or misleading evidence that indicated that Plaintiff had cut his own lock and staged the incident. For example, Plaintiff's union steward lied and gave Defendant a false statement, in which the steward stated that he saw Plaintiff cut the lock.

On February 4, 2003, Plaintiff met with Harvey and reiterated his complaints about racial discrimination and harassment at the Plant. He also informed Harvey about the locker incident.

On February 5, 2003, Vlasak and Bro suspended Plaintiff without pay pending the result of their investigation into the locker incident. Vlasak and Bro later determined that

Case 1:05-cv-00129-LRR    Document 27    Filed 03/06/07    Page 11 of 29

Plaintiff was "not credible," had "either changed or fabricated facts," made up the story and cut the lock on his own locker.

On February 21, 2003, Vlasak presented Plaintiff with a "major warning letter for dishonesty." The letter warned Plaintiff that "future behavior of dishonesty will be considered serious and grounds for immediate termination." Such a major warning letter for dishonesty is one of Defendant's highest forms of discipline short of termination.

Plaintiff filed a formal grievance through the Union for loss of pay and overtime. On March 18, 2003, Vlasak decided that, because of the "unusual nature of the incident," the suspension would be with pay. Vlasak maintained, however, that the discipline itself and any attendant loss of overtime was warranted.

Plaintiff initially grieved the paid suspension and loss of overtime, but Defendant forced him to drop it. At a meeting with representatives of the Union and management, Plaintiff was told that, if he continued to pursue the grievance, he would lose his job.

### L.  PM Incident

On November 25, 2003, it was Plaintiff's responsibility to perform preventative maintenance ("PM") related to Defendant's use of EO. EO is an extremely hazardous chemical. It is toxic, highly explosive, carcinogenic and flammable. Defendant's use of EO is regulated by federally mandated guidelines. The PM required Plaintiff to "stroke" numerous EO valves, confirm that the valves were working properly, ensure that the computers in the Plant's control room accurately reflected the status of each valve and complete a form.[5] Plaintiff had never completed this particular PM before and was never trained on it.

---

[5] The EO PM forms are two-pages long. Plaintiff completed only one page of the two-page EO PM form. DeHoedt was responsible for printing out the second page of the form, but did not do so.

12

While still in the control room before going into the field to perform the EO PM, Plaintiff wrote "Done" on the EO PM form and signed and dated it. It is common practice at the Plant to sign off on work orders in the control room before they are completed in the field.

Plaintiff asked Anson how to complete the EO PM. Anson told Plaintiff that he did not have time to help but might have some time later on. Anson advised Plaintiff to start working on other PMs.

After writing "Done" on the EO PM form, Plaintiff completed his other PMs but ran out of time to finish the EO PM. When Plaintiff left for the day, he intended to come back and finish the EO PM. Accordingly, Plaintiff left the EO PM form in the control room; he did not put the EO PM form in the "completed PMs" file box. When Plaintiff returned, however, the EO PM form had disappeared from the control room.

On December 17, 2003, David Wilhelmi dropped into Bro's office and gave him Plaintiff's EO PM form from November 25, 2003. David Wilhelmi told Bro that Plaintiff had signed off on the EO PM form, but he (David Wilhelmi) thought Plaintiff had not completed the EO PM.

Bro and newly appointed Facility Manager Michael Rizor[6] conducted a preliminary investigation. On January 13, 2004, Defendant suspended Plaintiff without pay pending a final investigation. Throughout the investigation, Defendant was completely honest and admitted he had made a mistake; he told them he had started the EO PM but failed to finish it. Bro and Rizor, however, believed that Plaintiff had falsified official records and committed an act of dishonesty.

On January 20, 2004, Defendant fired Plaintiff. The letter terminating Plaintiff's

---

[6] Rizor replaced Vlasak in July of 2003.

13

employment states:

> Effective today, January 20, 2004, your employment . . . is
> terminated. This termination is a result of recent dishonest
> behavior as well as violating requirements communicated to you
> in a letter from [Vlasak] dated February 21, 2003. The
> February letter stated that "future behavior of dishonesty will
> be considered serious and grounds for immediate termination."

After Plaintiff was fired, there were no African-Americans working in the Modhouse.

### M.  Eric Fisher

On October 13, 2003, one of Defendant's Caucasian employees, Eric Fisher, had the responsibility of unloading a truck that was leaking propylene oxide ("PO") and filling out an unloading permit. The permit required Fisher to sign off on many lines as he completed specified tasks. One of the required tasks was to remove a PO disposal line spool piece.

PO is similar to EO. It is a very dangerous, highly flammable and hazardous chemical. According to Bro, PO and EO were the two most dangerous chemicals at the Plant. Filling out a PO permit is an important safety measure.

Fisher signed off on the entire PO permit, including the line that indicated that he removed the PO disposal line spool piece. Fisher had not unloaded the PO disposal line spool piece.

On October 16, 2003, Schmitt discovered that the work on the leaking PO truck had not been completed. On October 21, 2003, Schmitt confronted Fisher and asked him "why you had signed off something that was not done." Fisher admitted that he had forgotten to unload the PO disposal spool piece and that he had made a mistake.

On October 29, 2003, Schmitt issued Fisher a written "verbal warning" and stated that "[f]urther actions of this type could result in disciplinary action up to and including termination." Such a written "verbal warning" is one of the lowest levels of discipline at

14

the Plant.

## VI. *CONTINUING VIABILITY OF* MCDONNELL-DOUGLAS

Because Plaintiff has no direct evidence of race-based discrimination or retaliation, Defendant urges the court to analyze Plaintiff's disparate treatment racial discrimination and retaliation claims[7] pursuant to the familiar three-part framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). In a lengthy argument that contains little citation to legal authority,[8] Plaintiff urges the court to abandon the *McDonnell-Douglas* framework. Plaintiff contends that the Supreme Court implicitly overruled the

---

[7] Although Plaintiff's Complaint invokes multiple provisions of Title VII, § 1981 and ICRA, the analysis for all of the discrimination claims is the same and the analysis for all of the retaliation claims is the same. Title VII and § 1981 have identical elements. *See Garner v. Mo. Dep't of Mental Health*, 439 F.3d 958, 960-61 (8th Cir. 2006) (equating Title VII and § 1981 retaliation claims); *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003) (recognizing that Title VII and § 1981 disparate treatment racial discrimination claims are the same and applying the *McDonnell-Douglas* framework to both); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997) (same). Absent any argument by the parties to the contrary, Plaintiff's ICRA claims are analyzed under the same analyses. *See, e.g., Twymon v. Wells Fargo &* Co., 462 F.3d 925, 933 n.4 (8th Cir. 2006) (equating Title VII and ICRA discrimination and retaliation claims); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1076 (8th Cir. 2006) (equating Title VII and ICRA discrimination and equating Title VII and ICRA retaliation claims); *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to "forge new ground" under ICRA in the absence of briefing).

[8] Plaintiff's counsel quotes extensively from "two paragraphs of explanation [that] were drafted by Judge Mark Bennett." Brief in Resistance (docket no. 22-5) at 24 n.7. Although Plaintiff's counsel represents to the court that "[t]he case cite is unknown," a simple Westlaw or LEXIS search reveals that the paragraphs are direct quotes from *Dunbar v. Pepsi-Cola General Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1195 (N.D. Iowa 2003). The Eighth Circuit Court of Appeals expressly disavowed *Dunbar* in *Griffith v. City of Des Moines*, 387 F.3d 733, 734-37 (8th Cir. 2004). Plaintiff does not acknowledge or discuss *Griffith* or its progeny.

15

*McDonnell-Douglas* framework in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

The Eighth Circuit Court of Appeals has repeatedly addressed and rejected Plaintiff's argument. "*Desert Palace* had *no* impact on prior Eighth Circuit summary judgment decisions." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (emphasis in original); *see also Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 n.4 (8th Cir. 2005) ("[T]he *McDonnell Douglas* framework remains the proper mode of analysis for summary judgment cases."); *Torlowei v. Target*, 401 F.3d 933, 934 (8th Cir. 2005) (similar). Accordingly, the court shall apply the *McDonnell-Douglas* framework. *See State Oil Co. v. Khan,* 522 U.S. 3, 20 (1997) (stating that is the Supreme Court's "prerogative alone to overrule one of its precedents"); *Okruhlik v. Univ. of Ark. ex. rel. May*, 255 F.3d 615, 622 (8th Cir. 2001) (holding district courts must follow controlling precedent and it is up to the Supreme Court to overrule its own decisions).

## VII. DISCRIMINATION CLAIMS

Under the *McDonnell-Douglas* framework, Plaintiff "has the initial burden of establishing a prima facie case of discrimination." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). To establish a prima facie case of discrimination, Plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Arnold v. Nursing & Rehab. Ctr. at Good Shepard, LLC*, 471 F.3d 843, 846 (8th Cir. 2006) (applying *McDonnell-Douglas* framework in termination context); *accord Twymon*, 462 F.3d at 934 (phrasing the second element as requiring Plaintiff to show he was "meeting the employer's legitimate job expectations"). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

16

If Plaintiff establishes a prima facie case, "a 'burden of production then shifts to [Defendant] to articulate a legitimate, non-discriminatory reason for firing [Plaintiff].'" *Twymon*, 462 F.3d at 934-35 (quoting *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

If Defendant produces such a legitimate, non-discriminatory reason, Plaintiff "must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Twymon*, 462 F.3d at 935. "'A reason cannot be *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in *Hicks*).

### A. Prima Facie Case

#### 1. Membership in a protected class

Plaintiff is an African-American. The parties agree that he is a member of a protected class. *See, e.g., Davis v. KARK-TV, Inc.*, 421 F.3d 699, 704 (8th Cir. 2005) ("Davis, as an African-American, is a member of a protected class.").

#### 2. Qualification

Plaintiff contends he meets the second element of the prima facie case, because he was "qualified for his position." Defendant contends that Plaintiff cannot meet the second element of the prima facie case, because he was not "meeting [Defendant's] legitimate job expectations." Defendant alleges that Plaintiff was not meeting Defendant's legitimate job expectations, because it found he was dishonest in February of 2003 and November of 2003.

17

The parties' arguments reveal some tension in the Eighth Circuit Court of Appeals's precedents. In some cases, the Eighth Circuit Court of Appeals requires a plaintiff to show that he was qualified for his position, but in other cases it requires a plaintiff to show that he was meeting a defendant's legitimate job expectations. *Compare Arnold*, 471 F.3d at 846 (qualified), *with Twymon*, 462 F.3d at 934 (legitimate job expectations). *See also Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006) (recognizing tension and stating that proving legitimate job expectations is a seemingly more onerous burden than requiring proof of qualification). In one of its most recent cases, however, the Eighth Circuit Court of Appeals made clear that Plaintiff is not required to show that he executed his duties or performed his job satisfactorily. *Arnold*, 471 F.3d at 846; *see also Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (requiring proof that plaintiff was "qualified for his position and performed his duties adequately"). To require such proof would "'raise[] the standard set by the Supreme Court for what suffices to show qualification.'" *Arnold*, 471 F.3d at 846 (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001)). As one noted treatise explains,

> At this stage of the proceedings, plaintiff is only required to demonstrate that he or she possessed the basic skills necessary to perform the job sought. The employer's stated reason for taking the adverse employment action is not considered at this stage of the analysis, since to do so would conflate the separate stages of the inquiry. As one court has observed:
>
> > When an employee's failure to meet objective, employer-imposed criteria is one of the legitimate, non-discriminatory reasons advanced by an employer to dispel the inference of discrimination raised by an employee at the prima facie stage, it cannot also be used to defeat the employee's prima facie case. To hold otherwise would be tantamount to collapsing the first and

18

> second stages of the *McDonnell Douglas* analysis
> and would deny a plaintiff the opportunity to
> demonstrate that the defendant's explanation for
> the adverse employment action is pretextual.

Abigail Cooley Modjeska, *Employment Discrimination Law* § 1:9 (3d ed. 2006) (footnotes omitted) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000)).

Plaintiff was an experienced employee with a perfect attendance record and an excellent safety record when he bid into the Modhouse. He had also previously worked in the Modhouse. *See Arnold*, 471 F.3d at 846 (holding plaintiff was qualified as a licensed practical nurse because she had worked as a licensed practical nurse for a year before her discharge). Once in the Modhouse, Plaintiff passed all of his training examinations. Plaintiff was qualified for his position and has thus met the second element of the prima facie case.

### 3.    Adverse employment action

Plaintiff was suspended without pay and later fired. The parties agree that he suffered an adverse employment action. *See Sallis*, 408 F.3d at 476 (termination and reduction in pay are adverse employment actions).

### 4.    Circumstances giving rise to an inference of discrimination

Plaintiff contends that he was fired under circumstances giving rise to an inference of discrimination. Plaintiff argues that Eric Fisher, a Caucasian employee, was similarly situated to him but not fired. Defendant avers that Fisher was not similarly situated to Plaintiff, because Plaintiff intentionally failed to fill out the EO PM form; Plaintiff initially lied when confronted about the PM; Plaintiff's conduct related to an EO PM, not a PO permit; EO is the most dangerous chemical at the Plant; and Plaintiff had previously

19

received a warning for dishonesty.

Evidence that Defendant treated Plaintiff less favorably than "'similarly situated employees who are not in [Plaintiff's] protected class'" may raise an inference of discrimination. *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (quoting *Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996)). The court holds that Fisher, who was not in Plaintiff's protected class, was similarly situated to Plaintiff. When the facts are viewed in the light most favorable to Plaintiff, Plaintiff did not intentionally fail to complete the EO PM form and did not lie when confronted about the PM.

Defendant's attempt to distinguish the EO PM form from the PO permit is also unavailing. The purpose of filling out the EO PM form and the PO permit is the same: they are Defendant's mechanisms for ensuring that proper safety measures are taken. Any differences in the forms themselves are immaterial. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 859 (8th Cir. 2005) (Colloton, J., concurring) (clarifying that proposed analogue employees need not be similarly situated in all respects, only all relevant respects).

Moreover, any differences between EO and PO is immaterial: both are highly dangerous hazardous chemicals. For present purposes, the important point is that both Plaintiff and Fisher filled out a form indicating that an important safety task was completed when the task was not completed. Only Plaintiff was fired. As Bro himself testified, "it doesn't matter who does that . . . . Falsifying records is falsifying records." Plaintiff and Fisher were "involved in or accused of the same offense"—falsifying records—"and [were] disciplined in different ways." *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 858 (8th Cir. 2004) (internal quotation and emphasis omitted). Their offenses were of "comparable seriousness." *Cf. Rodgers*, 417 F.3d at 853-54 (holding that two bank employees were not similarly situated, because plaintiff had violated the employer's policy eight more times and for far less amounts). They had the same supervisor. *Cf. Forrest v. Kraft Foods, Inc.*, 285

20

F.3d 688, 692 (8th Cir. 2002) (holding that two employees were not similarly situated because they had different supervisors).

The fact that Plaintiff had a prior record of dishonesty does not undermine the inference of discrimination. The prior record stems solely from the locker incident, which a jury could find was, in itself, the result of unlawful discrimination or retaliation. When the facts are viewed in the light most favorable to Plaintiff, a jury could find that this prior "record" was a sham, insofar as Plaintiff was falsely accused of staging the incident because he had repeatedly complained about racial discrimination and harassment. Moreover, even if Plaintiff had a legitimate prior record of dishonesty, it does not explain the degree of disparity in the treatment here. Fisher received a written "verbal warning," one of Defendant's lowest levels of punishment, while Plaintiff suffered the ultimate punishment, termination of his employment. Defendant terminated Plaintiff even though he had thirteen years of service and no other evidence of dishonesty. *Cf. Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (concluding that length of service can be relevant to disparate treatment analysis if the total number of reprimands is put at issue).

### 5. *Conclusion*

In sum, the court holds Plaintiff has established a prima facie case of discrimination.

## B. *Legitimate, Non-Discriminatory Reason*

Defendant offers a legitimate, non-discriminatory reason for firing Plaintiff. Defendant points out that dishonesty and falsifying company records violate its General Code of Conduct. Defendant does not dispute that Plaintiff has met its burden of production. Accordingly, the court holds that Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination. *See Twymon*, 462 F.3d at 935 ("We have consistently held that violating a company policy is a legitimate, non-discriminatory

21

rationale for terminating an employee."); *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) (violation of a company policy is a legitimate reason for termination).

### C.  Pretext

Plaintiff's and Defendant's arguments about pretext mirror the arguments set forth in the fourth element of the prima facie case.  This is understandable, because "[a] common way of proving pretext is to show that similarly situated employees were more favorably treated."  *Putman*, 348 F.3d at 736 (citing *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972-73 (8th Cir. 1994)).  When such a showing is made at the fourth element of the prima facie case, the two analyses can collapse.  *See id.* ("In some cases, we have concluded that evidence of pretext—normally considered only at step three of the *McDonnell Douglas* analysis—satisfied [the fourth element] of the plaintiff's prima facie case burden.").

Although the burden at the pretext stage is higher than at the prima facie case stage, *see Rodgers*, 417 F.3d at 852-54, the court incorporates its findings in Part VII(A)(4) of this Order and holds that Plaintiff has presented sufficient evidence to show that Plaintiff's proffered reason for terminating him was pretextual.  "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Reeves*, 530 U.S. at 147.

### D.  Conclusion

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Id.* at 153; *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 568-69 (8th Cir. 2000).  The court holds that Plaintiff has generated a genuine issue of material fact as to whether he was the victim of intentional discrimination.

This case presents a classic question of fact for the jury.  There are two sides to this

story. The jury could find, as Defendant alleges, that Plaintiff is a dishonest employee who fabricated an incident of racial discrimination and later intentionally falsified an important safety document. Alternatively, the jury could find, as Plaintiff alleges, that Defendant employed racist workers and supervisors that framed Plaintiff for the locker incident, used the EO PM as a pretext for firing him and then fired him because he is African-American. Accordingly, the court shall deny Defendant's Motion as to Plaintiff's racial discrimination claims.

## VIII. RETALIATION CLAIMS

Because Plaintiff has no direct evidence of discriminatory retaliation, the three-step *McDonnell-Douglas* framework for retaliation applies. First, Plaintiff "must put forth a prima facie case of retaliation." *Twymon*, 462 F.3d at 936. To establish a prima facie case of retaliation, Plaintiff must show: (1) participation in a protected activity; (2) adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Id.* Second, if Plaintiff puts forth a prima facie case, Defendant "may rebut the resulting presumption of discrimination by articulating a legitimate, non-retaliatory reason for the adverse employment action." *Id.* Third, if Defendant offers a legitimate, non-retaliatory reason, Plaintiff "may attempt to refute the asserted reason as mere pretext." *Id.*

### A. Prima Facie Case

#### 1. Protected activity

Defendant concedes that Plaintiff engaged in protected activity in early 2002, when he complained to Vlasak and Hyatt about a number of matters, including Defendant's poor record of hiring and retaining minority workers; Defendant's hiring of a less qualified Caucasian applicant, Alex Wilhelmi, over a more qualified African-American applicant, Coleman; Defendant's discriminatory testing standards; and the racist slurs and jokes in the

Case 1:05-cv-00129-LRR   Document 27   Filed 03/06/07   Page 23 of 29

workplace. Defendant also does not dispute that Plaintiff engaged in protected activity in November of 2002, when he alleged that "certain individuals [were] trying to sabotage [his] job and reputation," and expressed his disappointment with Hyatt's "supposed[] . . . investigation" about his complaints of racial discrimination and harassment and lack of "follow-up." The court holds that these actions constitute protected activity. *See Sallis*, 408 F.3d at 477 (8th Cir. 2005) (stating that complaining to supervisors and employer's human resources department constitute protected activity).

Plaintiff also claims he engaged in protected activity in February of 2003, when he met with Harvey. At the meeting, Plaintiff informed Harvey about the locker incident and reiterated his complaints about racial discrimination and harassment at the Plant. Again, the court holds that Plaintiff's complaints constitute protected activity. *See id.*

### 2. *Adverse employment action*

In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court announced a new standard for the adverse employment action requirement in the context of a Title VII retaliation claim. The newly announced standard differs from a more stringent one previously used by the Eighth Circuit Court of Appeals. *See id.* at 2410 (citing *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir.1997)). The Supreme Court ruled that "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13 (citation omitted). It determined that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quotations omitted). The Supreme Court explained that it "speak[s] of *material* adversity because [it] believe[s] it is important to separate significant from trivial harms." *Id.* (emphasis in original). The

Case 1:05-cv-00129-LRR   Document 27   Filed 03/06/07   Page 24 of 29

Supreme Court further explained that it "refer[s] to reactions of a *reasonable* employee because [it] believe[s] that the provision's standard for judging harm must be objective." *Id.* at 2415 (emphasis in original). Under this standard, Plaintiff clearly suffered an adverse employment action when Defendant suspended and fired him in January of 2004. *Id.* at 2412-15; *see also Sallis*, 408 F.3d at 476 (termination and reduction in pay are adverse employment actions under the old standard).

### 3. Causal connection

Defendant contends that Plaintiff cannot show a causal connection between his protected activities and the adverse employment action, because too much time elapsed. Approximately eleven months elapsed between Defendant's complaints to Harvey in February of 2003 and Plaintiff's suspension and termination in January of 2004.[9] The court agrees that the timing of Plaintiff's discharge, standing alone, is insufficient to establish a causal connection. *See, e.g., Wallace v. Sparks*, 415 F.3d 853, 859 (8th Cir. 2005) (holding nearly one-year lapse failed to establish causal connection); *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir. 2001) (holding seven-month lapse failed to establish causal connection); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346-47 (8th Cir. 1996) (holding one-month lapse failed to establish causal connection). Indeed, the Eighth Circuit Court of Appeals "has held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, *see Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), and that a two-week interval was 'sufficient, but barely so,' *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)." *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006), *reh'g and reh'g en banc*

---

[9] Defendant erroneously characterizes the elapsed period as two years, because it does not acknowledge the February of 2003 complaints to Harvey as protected activity.

*denied* (Jan. 29, 2007).

However, Plaintiff does not contend that timing alone establishes the causal connection in this case. Plaintiff contends that a jury could find that Defendant made its retaliatory motive clear in the termination letter, which stated that the "termination [was] a result of recent dishonest behavior *as well as violating requirements communicated to you in a letter from [Vlasak] dated February 21, 2003*." (Emphasis added.). Plaintiff characterizes the February of 2003 suspension as retaliation for his wide-ranging complaints of discrimination.

It is not unusual for timing alone to be insufficient to establish a causal connection between protected activity and adverse employment action. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005). The court must evaluate the timing in light of the other evidence (or lack thereof) in the record. *Id.* "To establish a causal link . . . , the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d at 865 (quotations omitted). "[E]vidence that gives rise to 'an inference of retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Kipp*, 280 F.3d at 897 (quoting *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir.1992)). However, "[a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005).

The court holds that the termination letter may provide a causal connection between Plaintiff's protected activity in February of 2003 and his firing in January of 2004. The termination letter clearly states that the locker incident played a part in Defendant's decision

to terminate Plaintiff.[10]   A jury could find that the locker incident and subsequent termination was retaliation for Plaintiff's protected activities.  *There* the timing is crucial. The day before Harvey was scheduled to interview Plaintiff's coworkers and supervisors about Plaintiff's complaints of racial discrimination and harassment, Plaintiff's locker was vandalized.  Harvey's visit was well known around the Plant.  When Plaintiff then persisted in his efforts to free himself of racial discrimination and harassment and reiterated his complaints to Harvey on February 4, 2003, Defendant suspended Plaintiff less than twenty-four hours later.[11]  *See, e.g., Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 859-60 (8th Cir. 1998) (holding plaintiff established a causal connection when adverse employment action occurred very close in time to the protected activity); *Smith*, 302 F.3d at 833 (holding that a two-week interval was "sufficient, but barely so").  Plaintiff, a long-time employee with no prior record, was given a "major warning letter," one of the most severe forms of discipline at the Plant.  Thus, although the termination letter does not explicitly admit retaliatory intent, the jury could find it does so implicitly in light of the facts and circumstances surrounding the prior suspension.  *Cf. Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728-29 (7th Cir. 2003) (finding a causal connection, despite a three-month lapse of time between the protected activity and the adverse employment action, because the protected activity was mentioned at meeting immediately preceding the termination); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543-44 (6th Cir. 2003) (finding a causal connection, despite an eleven month lapse of time between the protected activity and the adverse

---

[10] The court also notes that Bro and Rizor admitted in their depositions that the locker incident played a part in the decision to terminate Plaintiff.

[11] Harvey's and Bro's notes reveal that Plaintiff made the complaints at some point after 3:30 p.m. on February 4, 2003; he was suspended at approximately 1:00 p.m. on February 5, 2003.

Case 1:05-cv-00129-LRR   Document 27   Filed 03/06/07   Page 27 of 29

employment action, because on the last day of the employee's employment, his supervisor stated that he would "get back" at those who had complained); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999) (holding that a termination letter, which explicitly referred to the plaintiff's month-old complaints, raised an inference that retaliation was at least a motivating factor in the employer's decision to terminate the plaintiff). A jury could find the termination letter was a follow-through of Bro's statement in January of 2003 that Plaintiff ought to "stop complaining because someone [is] going to get fired." This is not a case in which the plaintiff received repeated reprimands for dishonesty or performance before he engaged in protected activity. *Cf. Kneibert v. Thompson Newspapers, Mich. Inc.*, 129 F.3d 444, 455 (8th Cir. 1997) (seizing on the fact that the plaintiff had received repeated reprimands for his performance problems before he engaged in protected activity).

Accordingly, the court holds that Plaintiff has shown a causal connection for his retaliation claims, and thus has established a prima facie case.

## B. Legitimate, Non-Retaliatory Reason

Defendant incorporates by reference its discussion of a legitimate, non-discriminatory reason for Plaintiff's discharge into its discussion of a legitimate, non-retaliatory reason for Plaintiff's discharge. Again, Defendant points out that dishonesty and falsifying company records violate its General Code of Conduct. Defendant does not dispute that Plaintiff has met its burden of production. Accordingly, the court holds that Defendant has presented a legitimate, non-retaliatory reason for Plaintiff's termination. *See Twymon*, 462 F.3d at 935 ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.").

## C. Pretext

Defendant incorporates by reference its discussion of pretext for Plaintiff's discrimination claims into its discussion of pretext for Plaintiff's retaliation claims. Because

the court found that Plaintiff presented sufficient evidence of pretext for his discrimination claims, the court also finds Plaintiff has presented sufficient evidence of pretext for his retaliation claims. A jury could find that Defendant fired Plaintiff because he complained about racial discrimination and harassment at the Plant.

### D. Conclusion

"The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent." *Wallace v. DTG Opers., Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006). Plaintiff has generated a genuine issue of material fact as to whether his firing was motivated by retaliatory intent. The jury could find, as Plaintiff alleges, that Defendant fired him to retaliate for his prior complaints of racial discrimination and harassment. Accordingly, the court shall deny Defendant's Motion as to Plaintiff's racial retaliation claims.

## IX. DISPOSITION

The Motion is **DENIED**. This case shall proceed to a trial by jury on all counts in the Complaint.

**IT IS SO ORDERED.**

**DATED** this 6th day of March, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

29